UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DAVID WILSON,<br><br>    Plaintiff,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF JUSTICE, *et al.*,<br><br>    Defendants. | Civil Action No. 13-2053 (JEB) |

**MEMORANDUM OPINION**

Plaintiff David Wilson claims that he is an innocent man. Convicted in 2007 of aiding and abetting a double murder, Wilson is currently serving a term of imprisonment that will last for over forty years. While in prison, he penned a Freedom of Information Act request for evidence that he believes will help to exonerate him. In particular, he asked for a recording of a conversation between a "Confidential Source" and the principal perpetrator of the murders, a man named Antonio Roberson. The existence of the tape – albeit not its contents – was disclosed at Wilson's trial. So, Wilson says, was the name of the "Confidential Source" on the tape, whom he identified in his FOIA request as Bobby Capies, a known informant who testified against him.

In answer to Wilson's request for the tape, the Department of Justice issued a so-called "Glomar response," refusing to confirm or deny the recording's existence. DOJ cited privacy concerns relating to Roberson and (if he happened to be the "Source") Capies. Wilson then brought this suit, and DOJ has now moved for summary judgment, contending that its actions comply with FOIA's demands.

1

The Court disagrees. It is already public knowledge that Roberson was captured on the recording, thanks to DOJ's own prior disclosures. It is also public knowledge – again, thanks to DOJ's disclosures – that Capies served as an informant in Wilson's case. As a result, DOJ has already vitiated any privacy interest that Roberson and Capies might have had in concealing the tape's existence. The Department must, at the very least, confirm or deny that it has a copy of the requested recording. The Court therefore denies summary judgment and will allow Wilson's case to proceed.

**I.     Background**

Testimony at Wilson's trial – apparently believed by the jury – painted the following picture: During the 1990s, the Congress Park neighborhood in Southeast Washington was the site of a sometimes-bloody turf war between rival gangs. See United States v. Wilson (Wilson I), 720 F. Supp. 2d 51, 56 (D.D.C. 2010) (denying motions for judgment of acquittal and new trial). Wilson was allegedly a member of one of those gangs, the Congress Park Crew. See id. Early one morning in August 1998, Wilson and two of his associates were in the neighborhood and spotted a man named Ronnie Middleton sitting in his Ford Bronco. See id. Middleton, a member of the rival 1-5 Mob, had purportedly shot one of Wilson's friends some years before. See id. Wilson and his two companions left the scene to pick up a gun. See id. As Wilson drove the crew back past Middleton's Bronco, one of Wilson's associates, Roberson, opened fire on the car. See id. The shots killed Middleton and his companion Sabrina Bradley, who was also in the vehicle. See id.

By the time of Wilson's trial in 2007, both Roberson and his other associate, Antoine Draine, were dead. See Jim McElhatton, D.C. Man Gets More than 40 Years in Congress Park Killings, Wash. Times, Mar. 13, 2011, available at http://goo.gl/ttrCen. Wilson thus stood alone

2

to answer for the killings. He was convicted of the double homicide, among other offenses, on the theory that he was the driver and thus aided and abetted the murders. See United States v. Wilson (Wilson II), 766 F. Supp. 2d 106, 107 (D.D.C. 2011) (denying motion for new trial). His conviction was based in part on the testimony of Bobby Capies, whom the Government identified as an informant in at least one submission on the trial docket. See Wilson I, 720 F. Supp. 2d at 62; Reply, Exh. 1 (Custodial Interview of Bobby Capies) at 1. At trial, Capies testified that he had spoken with Wilson, who had admitted to driving the car out of which Roberson fired the fatal shots. See Wilson I, 720 F. Supp. 2d at 62.

Despite his conviction, Wilson staunchly maintains his innocence. In 2008, he moved for a retrial, partially based on the Government's withholding of information that could have been used to impeach Capies. See id. at 68-69. That motion was denied. See id. at 70-71. He moved for a retrial yet again in 2010, when one of his fellow prisoners submitted an affidavit claiming that he – not Wilson – drove the car on the night of the murders. Wilson II, 766 F. Supp. 2d at 107. That motion, too, was denied. See id. at 108-09.

Wilson still believes that the Government is concealing evidence that would prove his innocence. Specifically, he claims that DOJ possesses a recording of a conversation between Capies and Roberson in which the two discuss the Congress Park murders. See Surreply at 2-4. Wilson believes that Roberson names his accomplices on the tape and that the recording will prove that he was not one of them. See id. at 3-4.

The existence of the tape is not a matter of mere speculation. Rather, two documents disclosed in the wake of Wilson's trial indicate that such a record is likely to have been created. The first document describes a May 1999 police interview with Capies. See Capies Interview at 1-3. In the interview, he states that he spoke with Roberson and Draine on the phone the day

after the killings. See id. at 2. On that call, Roberson bragged that he had used his Glock to shoot up Middleton's Bronco. See id. Draine also boasted that he had been involved with the Middleton-Bradley shooting, and, apparently, Wilson's name was mentioned. See id. The second document, which was compiled a month later, describes a recording made by the Government and a "Confidential Source." Reply, Exh. 2 (Controlled Operation Involving a Confidential Source) at 1. In that document, the Government notes that the Source – just like Capies – allegedly spoke with Roberson around the date of the murder. See id. During that conversation, the Source confided, Roberson admitted to shooting up Middleton and Bradley's Bronco with a Glock nine millimeter – just as he had to Capies. See id. The Source noted that Roberson still bragged about the killings, and that it would not be difficult to record him talking about the shooting. See id. The Source was then wired up and did manage to capture a brief conversation with Roberson about the murders on tape. See id. at 1-2.

Although it is not crystal clear, Wilson has reached the logical conclusion that Capies was the Source mentioned in the second document. Armed with such reasonable belief, in January 2013, he filed a FOIA request with the Executive Office for U.S. Attorneys requesting a recording of the conversation that he believes took place between Capies and Roberson in June 1999. See Compl., ¶ 1. He claimed that the recording was Brady information that the Government should have disclosed during his trial, and, in any event, that the recording would help to exonerate him. See, e.g., id., ¶¶ 2-5, 7; see also Brady v. Maryland, 373 U.S. 83, 87 (1963) (requiring government to disclose "evidence favorable to an accused upon request," including "evidence [that] is material either to guilt or to punishment" such as exculpatory or impeachment material).

4

In February 2013, EOUSA issued a so-called "Glomar response," refusing to confirm or deny the existence of records responsive to Wilson's request. See Compl., App'x B (EOUSA FOIA Response) at 1. In other words, if the Government admitted to possessing the tape, it would be confirming Capies's voice on it. EOUSA's reply outlined the agency's policy that "[r]ecords pertaining to a third party" – such as Capies or Roberson – typically will not "be released absent express authorization and consent of the third party, proof that the subject of your request is deceased, or a clear demonstration that the public interest in disclosure outweighs the personal privacy interest and that significant public benefit would result from the disclosure of the requested records." Id. EOUSA withholds such third-party information because FOIA Exemption 7(C) protects "records of information compiled for law enforcement purposes . . . to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). When third parties are mentioned in records, the agency assumes that disclosure would invade their privacy.

Wilson appealed the determination to the Department of Justice's Office of Information Policy – although he provided DOJ with neither proof of Roberson's death nor the documents related to Capies and the recording. See Compl., App'x C (Wilson FOIA Appeal) at 1-2. OIP, accordingly, denied his appeal. See Compl., App'x D (OIP FOIA Denial) at 1.

Wilson then filed suit in this Court, as FOIA permits. See 5 U.S.C. § 552(a)(4)(B). DOJ and EOUSA – which the Court will refer to jointly as DOJ – have now moved for summary judgment, claiming that Exemption 7(C)'s privacy provisions cover any potentially responsive record. In opposition to that Motion, Wilson produced several documents that DOJ's FOIA attorneys were likely seeing for the first time: namely, the two documents regarding Capies and

the wire recording, and an obituary announcing Roberson's death in 2003. See Capies Interview at 1-3; Controlled Operation at 1-2; Opp., Exh. B (Homegoing Service for Antonio Dan Roberson). In turn, DOJ took account of this new information in its Reply – and Wilson answered those new counterarguments in a Surreply. DOJ objected to this additional round of briefing, but it nevertheless responded to the substance of the Surreply.

Because new information and arguments were (understandably) being revealed as late as the Government's Reply brief in this case, the Court will permit and will consider the additional briefing. Cf. Flynn v. Veazey Const. Corp., 310 F. Supp. 2d 186, 189 (D.D.C. 2004) ("If the movant raises arguments for the first time in his reply . . . the court will either ignore those arguments in resolving the motion or provide the non-movant an opportunity to respond to those arguments."). The Court now turns to the Government's Motion for Summary Judgment.

**II.     Legal Standard**

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact is one that would change the outcome of the litigation. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."). In the event of conflicting evidence on a material issue, the Court is to construe the conflicting evidence in the light most favorable to the non-moving party. See Sample v. Bureau of Prisons, 466 F.3d 1086, 1087 (D.C. Cir. 2006).

FOIA cases typically and appropriately are decided on motions for summary judgment. See Defenders of Wildlife v. Border Patrol, 623 F. Supp. 2d 83, 87 (D.D.C. 2009); Bigwood v. U.S. Agency for Int'l Dev., 484 F. Supp. 2d 68, 73 (D.D.C. 2007). In FOIA cases, the agency

bears the ultimate burden of proof. See U.S. Dep't of Justice v. Tax Analysts, 492 U.S. 136, 142, n.3 (1989). The Court may grant summary judgment based solely on information provided in an agency's affidavits or declarations when they describe "the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." Military Audit Project v. Casey, 656 F.2d 724, 738 (D.C. Cir. 1981).

### III. Analysis

Congress enacted FOIA "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." Dep't of Air Force v. Rose, 425 U.S. 352, 361 (1976) (citation omitted). "The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." John Doe Agency v. John Doe Corp., 493 U.S. 146, 152 (1989) (citation omitted). The statute provides that "each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules . . . shall make the records promptly available to any person." 5 U.S.C. § 552(a)(3)(A). Consistent with this statutory mandate, federal courts have jurisdiction to order the production of records that an agency improperly withholds. See 5 U.S.C. § 552(a)(4)(B); Dep't of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 755 (1989).

"Unlike the review of other agency action that must be upheld if supported by substantial evidence and not arbitrary or capricious, the FOIA expressly places the burden 'on the agency to sustain its action' and directs the district courts to 'determine the matter de novo.'" Reporters Comm., 489 U.S. at 755 (quoting 5 U.S.C. § 552(a)(4)(B)). "At all times courts must bear in

mind that FOIA mandates a 'strong presumption in favor of disclosure' . . . ." Nat'l Ass'n of Home Builders v. Norton, 309 F.3d 26, 32 (D.C. Cir. 2002) (quoting Dep't of State v. Ray, 502 U.S. 164, 173 (1991)).

      1. Glomar *Responses and Exemption 7(C)*

Generally, under FOIA, an agency must conduct a search and make requested records available unless they fall within one of the statute's nine enumerated exemptions. See 5 U.S.C. § 552(a)(3)(A), (b)(1)-(9). When an agency does withhold documents, it typically must explain what has been withheld and why. See, e.g., Vaughn v. Rosen, 484 F.2d 820, 825-28 (D.C. Cir. 1973) (requiring "relatively detailed" and "specific" explanations of withholdings). There is, however, an exception to even this rule when "confirming or denying the existence of [certain] records would" itself reveal protected information. Nation Magazine v. U.S. Customs Serv., 71 F.3d 885, 893 (D.C. Cir. 1995). Such a reply, refusing to confirm or deny the existence of records, is called a Glomar response, named after a Cold-War-era CIA project that the agency wished to keep confidential. See Marino v. Drug Enforcement Admin, 685 F.3d 1076, 1078 n.1 (D.C. Cir. 2012); Phillippi v. Cent. Intelligence Agency, 546 F.2d 1009, 1011 (D.C .Cir. 1976). "A Glomar response is 'an exception to the general rule that agencies must acknowledge the existence of information responsive to a FOIA request and provide specific, non-conclusory justifications for withholding that information.'" Marino, 685 F.3d at 1078 n.1 (quoting Roth v. Dep't of Justice, 642 F.3d 1161, 1178 (D.C. Cir. 2011)).

For a Glomar response to be appropriate, the Government must show that revealing the very existence of records would "cause harm cognizable under a[] FOIA exception." Wolf v. Cent. Intelligence Agency, 473 F.3d 370, 374 (D.C. Cir. 2007). The FOIA exemption at issue here is Exemption 7(C). That exemption protects "records of information compiled for law

enforcement purposes . . . to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). All parties agree that the wire recording at issue here was "compiled for law enforcement purposes." Id. § 552(b)(7). The parties disagree, however, as to whether revealing that the recording exists would "constitute an unwarranted invasion of personal privacy." Id. § 552(b)(7)(C). Specifically, the Government claims that Capies's privacy interest would be harmed if his role in the wire conversation were acknowledged.

In Glomar cases, Exemption 7(C) allows agencies to conceal the existence of responsive documents if the presence of such records in the agency's system would "associate the individual named in the request with criminal activity" or otherwise compromise the person's privacy. Nation Magazine, 71 F.3d at 893. Law enforcement agencies like the FBI and DOJ routinely issue Glomar responses "when responding to requests for documents regarding alleged government informants, trial witnesses, subjects of investigations, or individuals who may merely be mentioned in a law enforcement record." Department of Justice, Guide to the Freedom of Information Act 597-98 (2009 ed.). Such a response is often appropriate because the very "mention of an individual's name in a law enforcement file will engender comment and speculation and carries a stigmatizing connotation." Schrecker v. Dep't of Justice, 349 F.3d 657, 666 (D.C. Cir. 2003) (quoting Fitzgibbon v. CIA, 911 F.2d 755, 767 (D.C. Cir. 1990)); Roth, 642 F.3d at 1174 ("not only the targets of law-enforcement investigations, but also witnesses, informants, and . . . investigating agents have a substantial interest in ensuring that their relationship to the investigations remains secret").

Once a privacy interest sufficient to trigger Exemption 7(C) has been identified, courts must "balance the privacy interests that would be compromised by disclosure against the public

9

interest in release of the requested information" to determine whether the agency's response was appropriate. Beck v. Dep't of Justice, 997 F.2d 1489, 1491 (D.C. Cir. 1993) (quoting Davis v. U.S. Dep't of Justice, 968 F.2d 1276, 1281 (D.C. Cir. 1992)).

Of course, if the Government cannot identify a requisite privacy interest, then no balancing is necessary. Cf. Nation Magazine, 71 F.3d at 896 (unnecessary to redact public figure's name where he himself had disclosed the existence of dealings with the agency). For example, agencies cannot rely on Exemption 7(C) – or any other exemption – to withhold "information that has been 'officially acknowledged' or is in the 'public domain.'" Davis v. U.S. Dep't of Justice, 968 F.2d 1276, 1279 (D.C. Cir. 1992). To be sure, an agency is not obligated to confirm leaks or to otherwise divulge information where a plaintiff is plainly on a fishing expedition. See Public Citizen v. Department of State, 11 F.3d 198, 201 (D.C. Cir. 1993) ("even if a fact has been the subject of media speculation, its official acknowledgment could" cause damage). But where the agency itself has disclosed exactly the same information on a prior occasion, it must, at the very least, confirm the existence of that information in its records. See Marino, 685 F.3d at 1081-82 (Glomar response not appropriate where existence of records has been acknowledged); American Civil Liberties Union v. CIA, 710 F.3d 422, 427 (D.C. Cir. 2013) ("the plaintiff can overcome a Glomar response by showing that the agency has already disclosed the fact of the existence (or nonexistence) of responsive records").

At this stage of the litigation, the Court addresses one question and one question only: Was DOJ's Glomar response appropriate in this case, in light of the information that it had already disclosed at Wilson's trial? Put another way, does any privacy interest remain in concealing the recording's very existence, or is the metaphorical cat already out of the FOIA bag? The Government has identified three potential privacy interests at issue here: (1) Capies's

privacy interest, writ large; (2) Roberson's privacy interest, writ large; and (3) Capies's interest in not being associated with the particular recording identified by Wilson in his FOIA request. The Court will address each interest in turn to determine whether any privacy claims remain.

### 2. *Capies's Claim to Privacy*

As the Government has noted, "[W]itnesses, informants, and . . . investigating agents have a substantial interest in ensuring that their relationship to . . . investigations remains secret." Roth, 642 F.3d at 1174. As a witness and informant, then, Capies would ordinarily have a privacy interest in protecting information about his involvement with the case that has not already been disclosed. See, e.g., Fischer v. Dep't of Justice, 596 F. Supp. 2d 34, 48 (D.D.C. 2009) ("the fact" witness's or agents' "identities have previously been disclosed does not diminish their privacy interests").

Capies may indeed have a privacy interest in protecting the <u>content</u> of documents related to his cooperation here. As a confirmed government informant in Wilson's case, however, he does not have a privacy interest in concealing this status or the <u>existence</u> of Wilson-related documents. FOIA is very specific on this point. The Act states that "[w]henever informant records maintained by a criminal law enforcement agency under an informant's name or personal identifier are requested by a third party . . . , the agency may treat the records as not subject to the requirements of [FOIA] <u>unless the informant's status as an informant has been officially confirmed</u>." 5 U.S.C. § 552(c)(2). This means, according to the D.C. Circuit, that "when an informant's status <u>has been</u> officially confirmed," a Glomar response is not available, and "the agency must acknowledge the existence of any records it holds." Benavides v. Drug Enforcement Admin., 968 F.2d 1243, 1246 (D.C. Cir. 1992); see also Boyd, 475 F.3d at 388-89 (same).

DOJ's acknowledgement of at least one interview with Capies – through its documented disclosure at trial – officially confirmed his status as an informant in Wilson's case. See Capies Interview at 1-3. Capies himself, moreover, testified at Wilson's trial that "he was cooperating with Detective Mike Will of the Metropolitan Police Department beginning in 1999." Wilson I, 720 F. Supp. 2d at 68. The Government, therefore, cannot submit a Glomar response predicated on Capies's interest in remaining unaffiliated with Wilson's prosecution.

### 3. Roberson's Claim to Privacy

Next, the Court examines Roberson's privacy interests. It is important to remember that, at this stage, the Court is only considering whether Roberson has a privacy interest in concealing the very existence of the requested record. That is, Roberson may have a privacy interest in the content of the tape – but the question in evaluating a Glomar response is whether "the prior [public] disclosure establishes the existence (or not) of records responsive to the FOIA request, regardless whether the contents of the records have been disclosed." Marino, 685 F.3d at 1081.

Plainly, the answer here is yes – the records exist. The Government has already officially disclosed that, on June 14, 1999, a confidential source "met with Robinson [*sic*] and engaged him in conversation regarding the captioned shooting." Controlled Operation at 1. Roberson's ship has thus sailed. He has no privacy interest in concealing that this already-acknowledged conversation took place.

As Wilson points out, moreover, Roberson passed away some years ago. See Homegoing Service for Antonio Dan Roberson at 1. While that does not extinguish his and his family's privacy interest entirely, it does undermine the Government's Glomar case. See Schrecker, 254 F.3d at 166 ("The death of the subject of personal information does diminish to some extent the privacy interest in that information, though it by no means extinguishes that interest."). After all,

DOJ's response to Wilson strongly implied that records would be treated differently upon receiving "proof that the subject of [his] request is deceased." EOUSA FOIA Response at 1. DOJ thus seems to have a policy that Glomar responses are not categorically appropriate in such circumstances. This further reinforces the conclusion that Roberson (and DOJ by extension) has no remaining interest in hiding the recording's existence.

### 4. The June 1999 Recording

DOJ maintains that there is a separate interest – apart from Capies's and Roberson's general privacy concerns – in protecting the relationship between Capies and the "Confidential Source" on the June 1999 tape. In other words, the Government believes it should be able to avoid disclosing whether Capies was the informant involved in this particular recording. After all, they observe, the fact that an informant's identity has been disclosed in relation to one law-enforcement operation "does not prevent that party from being a 'confidential source' for other purposes." Shaw v. FBI, 749 F.2d 58, 62 (D.C. Cir. 1984). That is no doubt true. But what the revelation of an informant's status does prevent is the Government's issuance of a Glomar response refusing to confirm or deny the fact that records related to the informant exist – particularly when those records are connected to the very case in which the informant's assistance has been openly acknowledged. See 5 U.S.C. § 552(c)(2); Benavides, 968 F.2d at 1246. Yet, that is exactly what DOJ has done here.

* * *

Ordinarily, under Exemption 7(C), the Court would need to "balance the privacy interests that would be compromised by disclosure against the public interest in release of the requested information." Beck v. Dep't of Justice, 997 F.2d 1489, 1491 (D.C. Cir. 1993). Here, however, DOJ has identified no privacy interest adequate to justify its Glomar response. Accordingly, no

13

balancing is necessary. See, e.g., Marino, 685 F.3d at 1082 (Because requested information was within "the public domain . . ., we need not address whether the alleged 'public purpose' for the information he seeks is sufficient to outweigh exemption 7(C)'s personal privacy concerns."). DOJ must – at a minimum – confirm or deny whether the record Wilson is seeking exists. If it does, DOJ must either turn it over or explain the reasoning behind its withholding. See Vaughn, 484 F.2d at 825-28.

If DOJ is truly concerned about Capies's identity as the source, Wilson has offered a more tailored means of FOIA compliance. In his Surreply, he states for the first time that he "is not necessarily requesting the statements of the [source] in engaging Antonio Robinson [*sic*] on June 14, 1999." Surreply at 4. Rather, he "is only requesting the statement/confession of Anto[n]io Robinson as it pertains to the murders of Middleton and Bradley, and Robinson's statements as to the person(s) who assisted him in the murders of Middleton and Bradley." Id. Accordingly, if DOJ prefers, it may search for the Roberson wire recording and (leaving the identity of the informant undisclosed) either release only Roberson's side of the conversation or identify its reasons for withholding even that portion of the record. If Capies is not the informant on the tape, of course, DOJ could also (correctly) state that it has no document responsive to Wilson's request for a record of the conversation between Capies and Roberson in June 1999.

## IV. Conclusion

For the foregoing reasons, the Court concludes that DOJ's Glomar response is unjustified. The Court will therefore deny the Government's Motion for Summary Judgment. A separate Order consistent with this Opinion will be issued this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date: May 21, 2014

14